James T. BATES d/b/a Royal Electric
Construction Company, Appellant,

v.

Clarence W. McKAY, Jr., Excelsior
Springs Market, Inc., a corporation,
Excelsior Springs Development Co.,
Inc., a corporation, Excelsior Springs
Development Company, a co-partner-
ship, Super Market Developers, Inc., a
corporation, the Equitable Assurance
Society of the United States, a corpora-
tion, Mark Twain Empire Bank, a
banking corporation, and J & G Enter-
prises, Inc., a corporation, Respon-
dents.

No. WD 38148.

Missouri Court of Appeals,
Western District.

Dec. 16, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 3, 1987.

Application to Transfer Denied
March 17, 1987.

William J. Hill, Kansas City, for appellant.

Jack B. Robertson & Brian J. Fowler of Field, Gentry, Benjamin & Robertson, P.C., Kansas City, for respondents Super Market Developers, Inc., Excelsior Springs Development Co. and J & G Enterprises, Inc.

MANFORD, Judge.

This is a civil action by a contractor (appellant) to enforce a mechanic's lien against improvements made to a subleasehold, and against the subleasehold term, the leasehold term, and the freehold interest subject to the leasehold term. The judgment is affirmed.

Appellant presents two points on appeal and charges the trial court erred (1) in denying a mechanic's lien and refusing appellant's request to remove the improvements because the trial court incorrectly declared and applied the law pertaining to mechanic's liens against leasehold premises; and (2) in denying a mechanic's lien against the leasehold and freehold terms because the court's finding that the sublessee was not the implied agent for the lessee and the owner of the property was against the weight of the evidence.

The cause was tried to the court upon a stipulation of facts with twenty-five documentary exhibits. The pertinent facts gleaned from said evidence are as follows:

In 1969, Excelsior Springs Development Company, a partnership (defendant-respondent), began developing plans to build the Crown Hill Shopping Center on a 4.82 acre tract of land it owned in Excelsior Springs, Missouri. Phase I of its plans was for not less than 28,000 square feet, one-half of which was to be leased for use as a supermarket retail grocery store.

Associated Wholesale Grocers, Inc. (hereinafter "AWG"), not a party to this action, engages in a warehouse distribution business whereby it wholesales grocery products and supplies to independent retail supermarket grocers. It also engages in the on-going establishment, development and expansion of independent retail supermarket grocers as a market outlet for its warehouse distribution business. The market development phase of its business is conducted through its subsidiaries, Super Market Developers, Inc. (defendant-respondent) and Supermarket Investment Company, Inc. (not a party to this action).

On May 1, 1969, Excelsior Springs Development Company (hereinafter "owner-lessor") and AWG negotiated a long-term lease for space to be used as a retail supermarket grocery store in the proposed center when and if completed. While the base lease was executed in the name of AWG's subsidiary, Super Market Developers, Inc. (hereinafter "lessee-sublessor"), AWG participated in the execution of a subsequent amendment to the original lease wherein AWG guaranteed payment of rent and full performance by its subsidiary.

In executing the base lease, the parties recognized that owner-lessor intended to finance the construction of the shopping center on the strength, at least in part, of this base lease and the leases of other tenants. However, the terms of the base lease required lessee-sublessor to pay certain costs of construction. The financing of these costs was handled by AWG by and

through its subsidiary, Supermarket Investment Company, Inc.

The terms of this base lease also expressly provided that lessee-sublessor "does not intend to operate the business to be conducted in the leased premises", and by reason thereof the base lease contained the express consent of owner-lessor for lessee-sublessor "to sublease or license the leased premises for operation of a supermarket grocery store" to a sublessee to be designated and whose name was to be inserted in a space provided for such purpose in the base lease. The base lease provided still further that lessee-sublessor shall not thereafter assign its rights under the lease or re-sublet the premises without the written consent of owner-lessor.

The base lease was for a term of twenty years and provided for a minimum annual rent, graduated for the first four years, and then for a level annual rate during the balance of the term. In addition to the minimum rent, lessee-sublessor agreed to pay a "percentage rent," equal to the amount by which a 1.5% of gross sales exceeded the minimum rent. Lessee-sublessor agreed to make monthly reports of gross sales, to keep records and to make them available for inspection by owner-lessor.

The lease also permits, but does not require, lessee-sublessor to install all necessary partitions and "trade fixtures," including, but not limited to, shelving, cash registers, counters, cases, refrigeration equipment and built-in coolers and the like," with the express right of lessee-sublessor to remove all trade fixtures at the end of the lease terms provided that lessee-sublessor repair any damage resulting from the removal of the fixtures and providing that lessee-sublessor is not in default in payment of rent.

Several amendments were made to the base lease concerning increased rental space, increased rent, increased construction costs, and liability insurance.

On June 1, 1972, the leased premises became ready for occupation, and on July 19, 1972, the lease commenced.

Lessee-sublessor sublet the premises to one or more independent retail grocers for some seven years until October 29, 1979, when lessee-sublessor sublet the premises to Excelsior Springs Market, Inc. (defendant-respondent and hereinafter "first-sublessee") for a term equal to the sixteen and one-half years balance remaining on the base lease. The use of the premises, consistent with the base lease, was limited to a supermarket grocery store. Rent due under the sublease was equal to 105% of the amount which lessee-sublessor was obligated to pay owner-lessor under the base lease with its amendments. Also consistent with the base lease, the sublease required first-sublessee to make monthly reports of gross sales, to keep records, to make them available for inspection, and even to make some payments directly to owner-lessor.

As a condition precedent to the sublease, first-sublessee was required to declare its intent to "concentrate", and to continue to concentrate, the purchase of at least seventy-five percent of its grocery products and supplies from AWG. In lieu thereof, as a condition precedent to the sublease, or in event of default of such concentration, first-sublessee became obligated to pay an additional five percent of the annual rent and to obtain from first-sublessee's principal supplier an unconditional guaranty for the operation of sublessee's supermarket grocery store on the premises. Any such principal supplier so substituted had to be shown by first-sublessee to have a net worth of at least ten million dollars. The sublease further provided that the failure of first-sublessee to abide by the terms of the sublease gave lessee-sublessor the absolute right to terminate the sublease.

The sublease also prohibited first-sublessee from making any alterations without prior written consent of lessor-sublessee. In the event of default by first-sublessee, improvements which first-sublessee might make were required to be left on the premises and may, at the option of the lessee-sublessor, be rented to any subsequent sublessee under a subletting for the balance of the term of the sublease, and the proceeds of any rental thereof shall be payable to lessee-sublessor and shall be

applied to any deficiency of minimum rent, and the balance thereof shall be payable to first-sublessee. "All such improvements, store fixtures and equipment and parts and accessories thereto are hereby impressed with a lien in favor of [lessee-sublessor] to satisfy any damages or loss of rents which [lessee-sublessor] may suffer."

The sublease then provided that should the premises be abandoned by first-sublessee, or the sublease terminated for any cause, all such improvements, store fixtures, equipment and accessories on the premises would be considered abandoned property. As an extension to this provision, the sublease further provided that the lessee-sublessor would have the right, without notice, to sell or dispose of such property and to claim the sale proceeds as compensation for the removal or disposition thereof. As an alternative, the sublease provided that if the termination of the sublease was due to the fault of first-sublessee, lessee-sublessor had the option to purchase the fixtures and equipment for cash at book value on the date of termination.

On the same date the sublease was executed (October 29, 1979), first-sublessee borrowed $550,000 from Empire Bank (not a party to this action and hereinafter Bank). In connection therewith, and with the participation of lessee-sublessor, first-sublessee pledged its fixtures and equipment by assignment of its interest in the subleasehold to Bank as security for the loan. The assignment expressly provided that lessee-sublessor agreed to subordinate the contractual lien it had on the fixtures and equipment pledged by assignment. Lessee-sublessor and first-sublessee also expressly agreed that if first-sublessee should default in payment of the loan, Bank could remove and sell the fixtures and equipment at private sale, without notice, and assign the subleasehold to parties satisfactory to Bank.

On November 30, 1981, James T. Bates, doing business as Royal Electric Construction Company (plaintiff-appellant and hereinafter "contractor") entered into two contracts with Clarence W. McKay, Jr. (defendant-respondent) acting as agent for first-sublessee, whereby contractor, for a total contract price of $10,912.00, agreed to install on the premises an automatic transfer switch and other related items as back-up emergency power for certain check-out scanner equipment. The contract was signed by McKay individually. Contractor completed the work under the contract and received payment of only $2,728.00, leaving due the principal sum of $8,184.00.

After completion of the work, first-sublessee defaulted on the loan. Bank claimed its collateralized security interest in and to the fixtures, equipment and subleasehold of first-sublessee, and sold, transferred and assigned all of its right, title and interest in, under and to the subleasehold, which included the fixtures and equipment, to lessee-sublessor. Owner-lessor and lessee-sublessor entered into another amendment to the base lease to provide for a new schedule of percentage rent. Then, lessee-sublessor entered into a sublease with J & G Enterprises, Inc. (defendant-respondent and hereinafter "second-sublessee") for a term which coincided with the balance of the term of the base lease.

After lessee-sublessor received the assignment of the subleasehold from Bank, lessee-sublessor did not destroy or remove the improvements in question from the premises. The second sublease contained the same provisions as did the first sublease except that second-sublessee agreed to "concentrate" at least sixty-five percent of its purchases of merchandise and supplies from AWG.

Clarence McKay subsequently filed a voluntary bankruptcy action in the United States Bankruptcy Court for the Western District of Missouri, Western Division. An order to lift stay order was entered by the bankruptcy court on October 27, 1982 for the sole purpose of enabling contractor to join McKay as a party defendant in the present action. However, the order lifting stay order does not allow enforcement of any resulting judgment against McKay.

On June 3, 1982, contractor filed his mechanic's lien, and on November 10, 1982, contractor filed this action to enforce same.

The court entered its findings of fact and conclusions of law and judgment in favor of appellant against McKay and first-sublessee (Excelsior Springs Market, Inc.). Further, the court held that the evidence did not support an implied agency between first-sublessee and owner-lessor and/or lessee-sublessor and therefore the freehold, leasehold and subleasehold interests are not subject to appellant's lien. Finally, the court held that appellant failed to introduce evidence on the economic feasibility and the possible damage the premises might suffer upon removing the improvements in question and therefore appellant's request to remove the improvements was denied. Review of this judgment is pursuant to *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

In his first point, appellant states that the trial court erroneously declared and applied the law because § 429.070.1, RSMo 1978, does not require that a lien claimant show economic feasibility as a condition precedent to a lien. Section 429.070.1, which deals specifically with liens in the case of licensed or leased property, states as follows:

> Every building, erection, improvement and plant erected or constructed, and all materials, fixtures, engines, boilers, pumps, belting, pulleys, shafting, machinery and other personal property furnished, or placed on licensed or leased lots or lands shall, regardless of whether or not the owner of the license or lease has the right thereunder to remove the same or other personal property from such licensed or leased premises during or at the end of the term thereof, be held for the debt contracted for on account of the same and also the licensed interest or leasehold term for such lot and land on which the same is placed or erected.

■ As is obvious, the statute is silent on a lien claimant's right to remove the encumbered property. Appellant recites a complete and exhaustive history of mechanic's liens in Missouri in support of his argument that the legislature did not intend to impose, as a condition precedent to a lien against licensed or leased premises,

the requirement that a contractor prove the economic feasibility of removing improvements made by him to such licensed or leased premises. Appellant's argument, however, is based upon the assumption that a lien claimant has a statutory right to remove encumbered property. This court holds that such assumption is false.

While this court recognizes the importance of examining historical aspects of a statute in determining legislative intent, it is equally important that the entire act be construed together. *See Collins v. Director of Revenue*, 691 S.W.2d 246, 251 (Mo. banc 1985), and *St. Louis Teachers Union Local 420 v. St. Louis Bd. of Education of City of St. Louis*, 666 S.W.2d 25, 27 (Mo.App.1984). Nowhere in Chapter 429 is it indicated that lien claimants may remove encumbered property. On the other hand, § 429.050 entitles a lien claimant to enforce the lien by way of execution sale and that the *purchaser* of the encumbered property may remove the improvements within a reasonable time thereafter. However, § 429.050 is limited in its application to liens obtained pursuant to §§ 429.010–429.040. Such liens are specifically for fixtures or improvements contracted for by the *owner* of the premises. Therefore, in construing § 429.070.1, it is presumed the legislature did not intend to allow enforcement of liens affecting leased premises by way of § 429.050, execution and removal. *Compare State v. Setter*, 721 S.W.2d 11 (Mo.App.1986) (Statute, by its very wording, applies only to specific sections. Therefore, legislature did not intend for statute to be applied to other sections not so enumerated.)

As noted *supra*, § 429.070.1 is silent as to the claimant's right to remove the improvement. The general rule is that one having a lien on personalty has no right, either at law or in equity, to sell or remove the property by virtue of his lien unless he is permitted by statute or by an order or decree of the court. 53 C.J.S. *Liens* § 13 (1948). *See also* 57 C.J.S. Mechanics Liens, § 267 (1948). Appellant argues that the court should construe § 429.070.1 as favor-

able to lien claimants as its terms permit, citing *R.L. Sweet Lumber Co. v. E.L. Lane, Inc.*, 513 S.W.2d 365, 371 (Mo. banc 1974). Appellant maintains that because there is nothing within the history of Chapter 429, or within § 429.070.1 itself, that indicates the legislature intended that "economic feasibility" be a condition precedent to establishing a mechanic's lien (or that lien claimants did not have the right to remove the property) then the terms of the statute would permit the construction appellant espouses.

■ Provisions not plainly written in the law or necessarily implied from what is written, should not be added by a court under the guise of judicial construction to accomplish an end the court deems beneficial. *Wilson v. McNeal*, 575 S.W.2d 802, 809 (Mo.App.1978). This court finds that a right of removal is not necessarily implied from the language of § 429.070.1. Therefore, no such right is conferred by statute. If a lien claimant is to be permitted to remove encumbered property, it must be by virtue of a court order or decree.

Appellant argues that neither statutory nor caselaw authority mandates a lien claimant show economic feasibility to *establish* a lien, and that the court erred in requiring such proof. Appellant misunderstands the purpose of the underlying action. The cause below was to *enforce* a mechanic's lien. The validity of the lien as against the first subleasehold was established by the evidence as stipulated. Appellant is correct in stating that proof of economic feasibility of removal is not a requirement to establish a mechanic's lien. However, in an action to enforce such a lien, courts have, and rightfully so, required a showing that removal of the improvement is economically feasible and will not damage the premises.

This court has researched other jurisdictions, as well as Missouri's, and, although caselaw on this point is indeed sparse, in every instance where a trial court has required a showing of economic feasibility or lack of damage to the premises, such re-

quirement has been upheld on appeal. Appellant's case is perhaps most similar to that in *Pioneer Sand & Gravel Co. v. Hedlund*, 178 Wash. 273, 34 P.2d 878 (1934). In *Pioneer*, appellant-contractor furnished the lumber for the construction of a sawmill and, after completion of the mill, the possessor of the land (who was not the owner thereof but who had contracted with appellant) defaulted on the payments under the contract. Appellant sought to have its lien as against the land and building thereon enforced against the owners of the land. Because the tenant was not an agent for the owners, the court held appellant could not enforce its lien as against the land. Appellant also requested the right to remove the mill subject to the lien. Appellant's pleading contained no suggestion as to "the practicability of removal of the mill," and there was no evidence introduced at trial "to show that the structure was, in fact, removable." The trial court denied appellant's request to remove the mill.

On appeal, the Supreme Court of Washington affirmed the trial court, stating:

[T]he court must first find that the property is removable, for otherwise it would be making a vain and useless order. The one seeking to establish a right or claim has the burden of proving the foundation of such right or claim. It is a part of his case. The burden is therefore upon the lien claimant to show the removability of the property, not upon the owner to show its irremovability. The fact to be established is an affirmative, not a negative, one. *Id.* at 881.

■ This court holds that the trial court did not err in declaring or applying the law, and that any order of removal rests within the sound discretion of the trial court. Such discretion has not been abused. Appellant's point (1) is ruled against him.

For his point (2), appellant argues that the trial court erred in denying a mechanic's lien against the leasehold and freehold estates because the court's finding that there was no implied agency between first-

sublessee and lessee-sublessor and/or owner-lessor was against the weight of the evidence. Section 429.010, RSMo Supp. 1984, which determines who may assert a lien and the extent of such lien, states in part:

> Every mechanic or other person, who shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection or improvements upon land, or for repairing the same, *under or by virtue of any contract with the owner or proprietor thereof, or his agent, trustee, contractor or subcontractor,* upon complying with the provisions of sections 429.010 to 429.340, shall have for his work or labor done, or materials, fixtures, engine, boiler or machinery furnished, a lien upon such building, erection or improvements, and upon the land belonging to such owner or proprietor on which the same are situated, to the extent of three acres; ... (Emphasis added)

It is undisputed that appellant did not contract with the owner of the premises, nor did he contract with lessee-sublessor. Appellant argues, however, there is an implied agency between first-sublessee and owner-lessor and/or lessee-sublessor. Appellant cites, among others, the following factors as evidence establishing the implied agency: both the base lease and the first sublease restricted the use of the premises; the corporate relationship between AWG and lessor-sublessee; the percentage rent, contained in both the base lease and the first sublease, was directly related to gross sales of first-sublessee, giving owner-lessor and lessee-sublessor an interest in the overall success of first-sublessee's operations; the concentration clause, contained in the first sublease, which required first-sublessee purchase a percentage of its merchandise and supplies from AWG; and the statement contained in both the base lease and the first sublease, which granted lessee-sublessor and first-sublessee permission to make certain alterations to the premises commensurate with the restricted

use of the premises. Appellant labels the entire set of transactions as a "venture", the overall "scheme" of which was to benefit AWG.

The trial court correctly held that the evidence did not establish an implied agency, citing *Messina Brothers Construction Co. v. Williford,* 630 S.W.2d 201 (Mo.App. 1982). In *Messina, supra,* the court summarized certain principles that have developed in determining whether a lessee is the agent of the lessor so as to impress the lessor's interest with a lien. Those principles are as follows:

(a) mere relationship of lessor lessee does not create agency;

(b) at the time of the execution of the lease the lessee must be obligated to make the changes or improvements;

(c) the improvements must be of substantial and permanent benefit to the leasehold;

(d) mere consent by lessor allowing change or improvements is insufficient; and

(e) in ascertaining the requisite intent, both the lease instrument and the whole of the circumstances may be considered. *Id.* at 210.

Examining each of these principles in light of the evidence, this court holds:

■ a). The corporate relationship between AWG and lessee-sublessor does not create an agency and even if such relationship was an issue, it would not be substantial evidence because AWG is not a party herein and there is no relationship between owner-lessor, lessee-sublessor and first-sublessee save their association as parties interested in the premises.

■ b). At the time of the execution of base lease, and thereafter the sublease, first-sublessee was not obligated, under the leases or otherwise, to make the changes and improvements in question. Although the leases grant permission to the tenant to make certain alterations, no such alterations were required or necessary as the

evidence established the premises had been used as a grocery supermarket for the seven years prior to the first sublease. *Compare Utley v. Wear*, 333 S.W.2d 787 (Mo.App.1960). In fact, paragraph seven of the first sublease required that the lessee-sublessor consent to any alterations to the premises. Appellant presented no evidence that owner-lessor or lessee-sublessor knew of or consented to the improvements in question.

■ c). In determining whether the improvements were of permanent and substantial benefit to the leasehold, it is appropriate to consider the improvement in question in relation to the size of the building, whether the improvements substantially altered the character of the premises, and the value to the lessor. *See Paul A. Medley, Inc. v. Money Town, Inc.*, 581 S.W.2d 46, 49 (Mo.App.1979).

In the present case, the improvements consisted of installation of electronic scanner equipment and related apparatus at a cost of $10,912.00. The premises consisted approximately 23,064 square feet of rental space which cost to construct was in excess of $160,000.00. Such improvements were minor in relation to the premises.

■ It is undisputed that the improvements did not substantially alter the character of the premises. The evidence established, in fact, that the premises had been used as a grocery supermarket for seven years prior to the first sublease, and that after the default of first-sublessee, the premises continued in such use.

■ Finally, there is no doubt that the improvements themselves were of value to the subleasehold, however, said improvements were of little or no value to the leasehold and/or freehold in view of the fact that the premises had been completely operational with the use of manual cash registers. Therefore, the trial court correctly held that the improvements were not a permanent and substantial benefit to the leasehold and/or freehold interests.

■ d). Appellant presented no evidence that owner-lessor and/or lessee-sublessor consented to the improvements and even if there was evidence of such consent, that in itself would be insufficient to establish an implied agency.

e). Finally, appellant argues that, from the whole of the circumstances, the evidence establishes the intent of the parties that first-sublessee act as agent for owner-lessor and/or lessee-sublessor. This court has examined the record in its entirety and finds no evidence of any such intent.

Alternatively, appellant argues that implied agency can be established by "ratification" on the part of owner-lessor and/or lessee-sublessor. Appellant cites no authority for the proposition that an implied agency may arise through ratification so as to subject a landlord's interest to a mechanic's lien. Appellant premises his argument on the inherent "unfairness" of allowing a landlord to benefit from improvements for which he is not liable.

This court recognizes the importance of balancing the equities in such a case, however, it is equally unfair to require a landlord be liable for improvements contracted for by a lessee or sublessee. In the present case, appellant was put on notice that first-sublessee was not the owner of the premises. *See Freeman v. Lefferdink*, 419 S.W.2d 266, 273 (Mo.App.1967). Appellant was in a better position to protect himself than was owner-lessor and/or lessee-sublessor (who, as the evidence suggests, had no knowledge that first-sublessee had contracted with appellant). Appellant could have secured the signatures of owner-lessor and/or lessee-sublessor to the contract, or he could have required first-sublessee pay in full before appellant completed the work.

This court sympathizes with materialmen and mechanics who are placed in this position when contracting with tenants. However, appellant has failed to establish an implied agency of owner-lessor and/or lessee-sublessor, and without such relationship, their interests may not be affected by

appellant's lien. Appellant's second point is ruled against him.

The judgment is affirmed.

All concur.